```
H6KVVARC
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JUAN CARLOS LARA VARGAS,
     ET AL,
 4
                    Plaintiffs,
 5
            v.                              16 CV 9151 (KPF)
 6
     KALAMOTI INC., ET AL,
 7
                    Defendants.             CONFERENCE
 8   ------------------------------x
                                             New York, N.Y.
 9                                           June 20, 2017
                                             4:08 p.m.
10
     Before:
11
                        HON. KATHERINE POLK FAILLA,
12
                                             District Judge
13
                              APPEARANCES
14
     MICHAEL FAILLACE & ASSOCIATES
15        Attorneys for Plaintiffs
     BY:  JOSHUA S. ANDROPHY
16
     PARADALIS & NOHAVICKA
17        Attorneys for Defendants
     BY:  ARIADNE PANAGOPOULOU
18

19

20

21

22

23

24

25
```

1           (Case called)

2           MR. ANDROPHY:  Good afternoon, your Honor.

3           Joshua Androphy of Michael Faillace & Associates, P.C.
4    for plaintiff.

5           THE COURT:  Sir, good afternoon.

6           MS. PANAGOPOULOU:  Ariadne Panagopoulou from Paradalis
7    & Nohavicka for all the defendants.

8           THE COURT:  Ms. Panagopoulou, good afternoon to you as
9    well.  You'll excuse me in advance as I mispronounce your name.

10          Mr. Androphy, I have the parties' joint submission.  I
11   guess we're sort of at the end of the road in terms of what we
12   can do short of trial, am I correct?

13          MR. ANDROPHY:  Yes, your Honor, I think so.  I think
14   we're done with discovery.  In the letter I mentioned a
15   possible summary judgment motion, but I don't intend to make
16   that.  So I think we are ready to schedule pretrial
17   submissions.  If your Honor would like to set a trial date at
18   this time, we're ready to do so.

19          THE COURT:  All right.

20          Now, I do want to speak with Ms. Panagopoulou about
21   one thing.

22          In a prior conference, I believe there was an issue
23   raised about whether the corporate entity, Kalamoti,
24   Incorporated, had sales exceeding $500,000.  At this time are
25   you conceding that point or not contesting that point or do you

1    wish to be heard on that issue?

2            MS. PANAGOPOULOU:  Your Honor, we don't contest the
3    point.  It was very close to 500,000, so we wanted to assert
4    that to keep it as an affirmative defense.  But we have, in
5    fact, checked the corporate defendant's tax returns and it
6    does, in fact, exceed that limit.

7            Another issue that I wanted to bring to the Court's
8    attention is that plaintiff has amended his complaint very
9    recently.  We'll be filing our amended answer very soon.  In
10   light of some statements made in the amended complaint -- I
11   agree with Mr. Androphy's statement that fact discovery is
12   complete, but we would like to request any tax returns filed
13   during that particular year which plaintiff is now alleging to
14   have worked for my client.

15           THE COURT:  Let's speak about that please.

16           My recollection of requests for tax returns is that
17   it's not merely that they are relevant, but that the
18   information that can be obtained from them cannot be obtained
19   from other sources.

20           Am I correct that that's the standard for tax returns?

21           MS. PANAGOPOULOU:  Absolutely, your Honor.

22           And I'll explain just very briefly what the issue is
23   regarding.

24           Plaintiff filed a complaint originally stating that he
25   worked for my client for some months in 2015 and 2016.  While

1    my client is disputing a little bit that employment period, he
2    does concede that he has worked -- that plaintiff has worked
3    for the corporate defendant during that period of 2015/2016.
4            THE COURT:  Just to be clear, my notes indicate that
5    the employment was in or about March of 2015 through October of
6    2016.  Am I correct?
7            MS. PANAGOPOULOU:  Yes.
8            My client says that this is largely accurate, apart
9    from a brief three-month leave that plaintiff took due to an
10   illness that he had.
11           However, plaintiff very recently amended his complaint
12   and alleged that he was employed further back in 2012 by my
13   clients.  My client says that he was present at the diner six
14   days a week; and that plaintiff simply didn't work for the
15   diner at that period, in 2012.
16           Now, obviously there is no way that my client will
17   have records of somebody's employment that simply didn't work
18   for the diner.  So the only source of information that could
19   bring some light to whether or not plaintiff was employed by
20   Ridgeway Diner is to look at plaintiff's tax returns filed for
21   that particular earlier employment period.
22           THE COURT:  Let me just look at one thing please.
23           Excuse me.
24           (Pause)
25           THE COURT:  I'm just trying to pull up the first

1    amended complaint.
2              (Pause)
3              THE COURT:  We've had discussions about this
4    previously, have we not, the 2012 period?
5              Okay.  So let me understand again, please, from
6    Mr. Androphy precisely what periods of time did your client
7    believe -- I see, from 2012 until 2013.
8              I am now reminded that this is exactly what we were
9    talking about during our discovery dispute in the case.  I
10   still don't understand how your client didn't know that at the
11   time of the original complaint that he worked there previously.
12             MR. ANDROPHY:  I'm sure he knew that.  I can only
13   guess that he didn't know that it was -- I don't want to
14   describe what he did or didn't tell us.
15             THE COURT:  Of course.
16             MR. ANDROPHY:  But suffice it to say in preparing the
17   original complaint, we were not aware of this period of
18   employment.  So I don't know if that's -- I can only speculate
19   as to why he -- why we didn't know of that beforehand, that
20   maybe the client didn't think that was something he could still
21   sue for.  I don't know.  I don't know why this only came up
22   when we -- a month or two ago when we were preparing for
23   depositions.
24             THE COURT: Yes.  Okay.  Thank you.
25             Mr. Androphy, do you have a position -- and I suspect

1    you do -- with respect to your adversary's request?

2            MR. ANDROPHY:  Yes.

3            We would maintain that, I think, as your Honor alluded

4    to, the standard is that the information is -- that there's --

5    the legal language is a compelling need for it and also that

6    it's not available from other sources.

7            THE COURT:  What's being said to me this afternoon and

8    what had been hinted at in a prior conference is that Mr. Lara

9    Vargas simply did not work for the company during that one-year

10   period.  To the extent that he is seeking, for example,

11   compensatory damages or other sort of damages for, let's say, a

12   failure to produce a wage statement or a failure to produce

13   payment stubs, they are saying there wouldn't be any because he

14   wasn't there.

15           I am interested in the argument that's being raised by

16   the defense that this is the only evidence we have of his

17   employment there other than, I suppose, his deposition

18   testimony; correct?

19           MR. ANDROPHY:  Yes.  I understand it's hard for the

20   defendants to prove a negative --

21           THE COURT:  Exactly right.

22           MR. ANDROPHY:  -- with documents.  They could.  I

23   don't recall exactly what types of documents the defendant

24   testified he kept at his -- at the establishment.  Certainly if

25   they did have something like an employment roster, a list that

|   |   |
|---|---|
| 1 | had names of everyone else who worked there and he wasn't on |
| 2 | it, I guess that would probably be something that would be |
| 3 | pretty good evidence for them.  I don't know.  I don't recall |
| 4 | if that came up in his deposition.  I don't know what kind of |
| 5 | records he has that there may be. |
| 6 |     THE COURT:  Let me explore this from a slightly |
| 7 | different perspective please. |
| 8 |     Your client was deposed under oath, yes? |
| 9 |     MR. ANDROPHY:  Yes. |
| 10 |     THE COURT:  In the course of his deposition he said |
| 11 | that he worked at this diner for one year, approximately one |
| 12 | year, from 2012 until 2013, yes? |
| 13 |     MR. ANDROPHY:  Yes. |
| 14 |     THE COURT:  Would it not be the case that if there |
| 15 | were tax returns filed by your client that did not list the |
| 16 | diner, that might go a long way to proving or disproving the |
| 17 | issue of whether he, in fact, worked during that period of |
| 18 | time? |
| 19 |     MR. ANDROPHY:  I agree that that could be probative of |
| 20 | the issue, yes. |
| 21 |     THE COURT:  I will certainly speak with the defense |
| 22 | about what other records they may have. |
| 23 |     If I may ask this question, and if you tell me you're |
| 24 | not comfortable answering, I will understand:  Does your client |
| 25 | regularly or irregularly file tax returns? |

1           MR. ANDROPHY:  When he was asked that at the
2    deposition, he invoked his Fifth Amendment privilege.
3           THE COURT:  All right.
4           Let me ask a more pointed question then.
5           If I order the production of tax records for tax years
6    2012 and 2013, will there be nothing produced in response?
7           MR. ANDROPHY:  I think that's most likely correct from
8    what I understand, yes.
9           THE COURT:  Okay.  I'm not interested in his dealings
10   with the IRS except insofar as they go to the issue of whether
11   or not he worked there.
12          Would your client stipulate to the fact that he either
13   did not file tax returns for those years or did not list the
14   defendants in this case as an employer on any tax returns he
15   may have filed during this period of time?
16          MR. ANDROPHY:  I think I would have to look into
17   that --
18          THE COURT:  Please do.
19          MR. ANDROPHY:  -- and make sure that both it's
20   factually correct and also that he would not be doing anything
21   that's self-incriminating by stating at least the first part of
22   that.
23          THE COURT:  Of course.  But I mean what we're left
24   with is the potential situation where he's asked this question
25   on the stand in front of the jury at a trial and he invokes the

1    Fifth Amendment, which I'm not sure he wants to do.
2            MR. ANDROPHY:  Right.  Right.
3            THE COURT:  So what I'm trying to do -- and I hope
4    it's obvious to both sides -- I want to know whether this is a
5    bit of a fool's errand because there are no such documents to
6    produce.  And if there aren't, I guess I'd like a
7    representation from you, sir, so that I don't go off trying to
8    compel something that doesn't exist.  But more than that, I
9    guess I'd like to understand what can be placed before the jury
10   in its stead.
11           MR. ANDROPHY:  Right.
12           THE COURT:  Because your client has elected to state
13   that he worked for the defendants for this year, quite some
14   time -- I would say six months -- after filing his initial
15   complaint in this case.  It is curious to me.
16           More than that, I do want to speak to your adversary
17   about what documents and information her client has.  Why don't
18   I do that before I talk to you again.  Thank you.
19           Let me understand, if I may, what types of records
20   your client -- I guess this would be -- would this be
21   Mr. Vitelas?
22           MS. PANAGOPOULOU:  Yes.
23           THE COURT:  Has he been the owner for the entire
24   relevant time period?
25           MS. PANAGOPOULOU:  Yes, your Honor.

1          THE COURT:  Going back to what date please?
2          MS. PANAGOPOULOU:  I don't remember exactly when he
3  was incorporated, but from the time period of incorporation he
4  was the owner.
5          THE COURT:  I'll ask the question differently.
6          In 2012, did he own and operate the diner?
7          MS. PANAGOPOULOU:  Yes.
8          THE COURT:  In 2013?
9          MS. PANAGOPOULOU:  Yes.
10         THE COURT:  2015?
11         MS. PANAGOPOULOU:  Yes.
12         THE COURT:  2016?
13         MS. PANAGOPOULOU:  Yes.
14         THE COURT:  I understand now.
15         Was he someone who remained on the premises each day
16  or was he an absentee owner of the establishment?
17         MS. PANAGOPOULOU:  He was somebody who was there at
18  the premises six days a week.
19         THE COURT:  And the place was open seven days a week?
20         MS. PANAGOPOULOU:  Yes.
21         THE COURT:  And what was his method or, if he
22  delegated it to someone else, their method of keeping track of
23  who the employees were at any given period of time?
24         MS. PANAGOPOULOU:  So I can only speak as to the named
25  plaintiff because I haven't inquired with him with regards to

other employees.  I know that a lot of people were put on payroll and paid by check because they provided Social Security numbers to my client.  But this particular employee indicated to my client that he wanted to be paid in cash.

The amount that he was paid was standard each week; in other words, it was 350 in 2015 and $400 in 2016.  So it was the same exact payment and the schedule was the same.  So it wasn't very difficult to keep track of the payments.

THE COURT:  Since he was being paid in cash, what record would there have been?  Would there have been some sort of slip that he signed or receipt or some other way of indicating that Mr. Lara Vargas had been paid?

MS. PANAGOPOULOU:  Unfortunately, because my client operates -- that diner is very, very small.

THE COURT:  Yes.

MS. PANAGOPOULOU:  And you have to understand, your Honor, my client is somebody who has only -- I believe he hasn't even finished high school.  He is not very business savvy.  And we concede that he should have kept some records, which he didn't keep unfortunately.  That doesn't mean that the plaintiff wasn't paid properly in this case; there is just unfortunately a lack of records documenting the payments.

THE COURT:  I understand that.

But if you're telling me that this information is needed to prove or disprove the allegation that Mr. Lara Vargas

1    worked at the diner during the period from 2012 to 2013, I'm a
2    little troubled by the argument that the reason you need the
3    tax returns is because your client actually kept no
4    contemporaneous written records.
5            MS. PANAGOPOULOU:  No, your Honor.  And I would
6    understand if that argument was made for the period of 2015 and
7    2016.  We are not making that argument because my client
8    concedes that plaintiff did work there; and we do have
9    individuals who are intending to testify on my -- also on
10   behalf of my client who have seen the plaintiff work during the
11   period of 2015/2016, but not the earlier period of 2012/2013.
12           THE COURT:  I see.
13           And so what you're saying is the difference with this
14   inquiry is he could have -- even if he were keeping records of
15   payments, he could not keep records of payments of a person who
16   is not his employee.
17           MS. PANAGOPOULOU:  Exactly.  Exactly.
18           THE COURT:  I understand that.
19           MS. PANAGOPOULOU:  And also something that is
20   troubling to me is that during his deposition, plaintiff
21   admitted working somewhere else in 2012.  And in this
22   particular litigation, he is claiming that he worked 61 to 71
23   hours per week for my client.  So if he simultaneously worked
24   for someone else during the same time period, those allegations
25   make his claims quite incredible.

H6KVVARC

1            THE COURT:  I understand.

2            On this record, Mr. Androphy, I am inclined to order

3    the production of the tax records for the tax years 2012 and

4    2013.  If it turns out your client does not have them for

5    whatever reason, would you please let me know by the end of

6    next week that that is the case or whatever you think is

7    appropriate.  If you want to consider working out some

8    agreement or stipulation with your adversary counsel about how

9    this information might be presented to the jury in a way that

10   does not compromise your client in other aspects of his life, I

11   would be interested in hearing it.

12           Let me then turn to, I suppose, the main event, which

13   is the setting of a trial date in this case.

14           If I have not spoken to you about this, I will tell

15   you for reasons I can't fully explain the remaining five months

16   of this year are extremely busy for me.

17           Mr. Androphy, this is a jury trial of one to two days

18   duration, sir?

19           MR. ANDROPHY:  Yes, your Honor.

20           THE COURT:  I actually have three, if not four, trials

21   scheduled for July, one for August, but I'm not sure -- my own

22   experience teaches that an August jury is not a happy jury and

23   you may not want that.  And then in September I have one long

24   trial.  October I have one one-week trial.  And then I have a

25   trial that takes up three weeks.  And then November I have -- I

1  am actually genuinely booked not only for the remainder of
2  December, but into January. So I'm very happy to see you in
3  early February. If you feel that that is too far out, we can
4  talk about whether you would want me -- you might consider
5  having it reassigned to Judge Netburn for all purposes, which
6  would include the trial in the case, or I can try and see if
7  there's another district judge who would be able to handle it.
8        But, again, the schedule that I just began lamenting
9  as I outlined it to you is very heavily composed of long-term
10 criminal cases that have Speedy Trial Act issues and they may
11 very well plead, but today they have not. And there are
12 multiple defendants in each of those cases.
13       So, Mr. Androphy, if you need time to react to that, I
14 will give that to you; but do you have any thoughts at this
15 time?
16       MR. ANDROPHY: I'd like to take some time to consider
17 that.
18       THE COURT: All right.
19       MS. PANAGOPOULOU: And from the defense perspective,
20 considering that an amended complaint was filed I believe a few
21 days back, defendants don't have a problem with the trial
22 taking place in February. I think this will also -- in case
23 another discovery dispute comes up, that will leave us enough
24 time to address it. I don't expect anything to come up.
25       THE COURT: I don't expect it either, but okay.

H6KVVARC

1           I'm absolutely fine with booking -- I'm looking right
2 now at early February.  But why don't you each consult with
3 your clients and let me know.
4           Again, I guess I gave you, Mr. Androphy, to the end of
5 next week for one issue.  Let me put this on that list as well.
6 By the end of next week just send me a letter.  And depending
7 on what you decide, I will see if there's another judge who can
8 take it.  Or speak to Judge Netburn; I'm sure she'd be happy
9 to -- she doesn't have that many trials, to the best of my
10 knowledge; she might welcome this one.  She has had trial
11 experience before.  Or we can do something else.
12           I'm comfortable or at least I'm understanding there is
13 no chance of this case settling at this time.  I mean there's
14 always a chance in the theoretical world, but neither of you is
15 suggesting it's going to happen.
16           MR. ANDROPHY:  I think I agree with that.  There's
17 always a chance, but nothing that seems imminent or very
18 likely.
19           THE COURT:  Okay.  Yes.
20           MS. PANAGOPOULOU:  Your Honor, we have actually made
21 an offer of judgment to the plaintiffs for the amount of
22 $30,000.
23           THE COURT:  Three zero?  30,000?
24           MS. PANAGOPOULOU:  Exactly.
25           I have received, during the initial filing of the

1  original complaint in this matter, a damages charge from
2  plaintiff's counsel where the back wages alone were $30,000.
3  We are now making an offer of judgment that reflects the full
4  amount of back wages that plaintiff alleges in this action in
5  their damages charge.  So we want to resolve it and I think our
6  offer was made in very good faith.
7           THE COURT:  Sure.  It does not appear that that offer
8  included what might be applicable liquidated damages; is that
9  correct?
10          MS. PANAGOPOULOU:  Yes, your Honor.
11          THE COURT:  Okay.  And I don't know as well whether it
12 specified reasonable attorneys' fees to be determined later or
13 whether attorneys' fees were not included in that figure, I
14 just don't know.  You can let me know.
15          MS. PANAGOPOULOU:  It was included.
16          But, your Honor, we do dispute the overtime claims.
17          THE COURT:  Of course.
18          MS. PANAGOPOULOU:  And if we were to make an offer
19 that is the same amount as plaintiff's damage calculations,
20 then there is no advantage to be gained.  From our perspective,
21 we might as well litigate this to trial.
22          THE COURT:  I understand that.
23          Let's just go off the record momentarily.
24          (Off record)
25          THE COURT:  So I will get a letter from one or both of

1     you at the end of next week letting me know your preferences.
2     I will schedule the trial or refer the trial as soon as I get
3     it.
4              Mr. Androphy, is there something else to discuss
5     today?
6              MR. ANDROPHY:  Yes.
7              Defense counsel mentioned in this conference about
8     other witnesses that they would have.  This isn't the first
9     time she's mentioned that in our discussions.
10             In discovery, these witnesses have never been
11    disclosed neither in the defendants' initial disclosures nor in
12    response to interrogatories.  I raised this previously.  They
13    hadn't been disclosed.
14             So discovery is over.  I don't know if defense counsel
15    actually has -- if defendants actually have these witnesses or
16    not, but we would certainly oppose any witnesses who haven't
17    been disclosed during discovery being called at trial.
18             THE COURT:  I understand that.
19             Ms. Panagopoulou -- so close -- are these witnesses
20    individuals whose identities have been disclosed to the
21    plaintiff?
22             MS. PANAGOPOULOU:  Your Honor, yes.  My client in his
23    deposition did state relevant people that were in the diner and
24    observed plaintiff work.
25             Plaintiff's counsel is correct, we haven't disclosed

1  them in a formal document. And we'll do that very, very soon.

2  THE COURT: Might it be too late to do that now? I'm
3  just wondering. The answer is I don't know. They weren't
4  disclosed in the initial disclosures under Rule 26(f); correct?

5  MS. PANAGOPOULOU: They weren't disclosed there.

6  The reason is, again, a big dispute arose when
7  plaintiff amended his complaint and added that year. Because
8  before the dispute was whether plaintiff worked 40 hours or
9  worked overtime; nothing was disputed in terms of -- really in
10 terms of how he was paid or in terms of the employment period.
11 This is a small diner and we did intend to bring pictures of
12 the diner that can be found online to show that, you know,
13 there's simply not that many dishes for plaintiff to have been
14 working there, you know, 71 hours per week. This is a small
15 diner. You don't need two dishwashers working that many hours
16 because there was another dishwasher actually employed at the
17 same time period as plaintiff.

18 THE COURT: Let me please ask a different question,
19 which is, recognizing that these individuals were not disclosed
20 in the initial Rule 26 disclosures, are you telling me now that
21 these other witnesses are relevant solely to the issues raised
22 by the amendments to the complaint?

23 MS. PANAGOPOULOU: I wouldn't say solely, but I would
24 say they are most useful in testifying to that period, yes.

25 THE COURT: You might be in a position of having to

1    explain to me in writing why they should be permitted to
2    testify to anything other than the new information that's
3    occasioned by the amendment to the complaint.
4            Mr. Androphy has indicated an objection to having them
5    testify at trial because they weren't previously disclosed.  I
6    have a certain amount of discretion in this regard, but I
7    think -- if you want them to talk about anything other than the
8    amendments, then you probably want to write me very quickly and
9    let me know why.
10           MS. PANAGOPOULOU:  Sure.
11           Your Honor, I'd also like to point out that the
12   depositions happened not too long ago.
13           THE COURT:  Of course.  But your client must have
14   known prior to sitting down for his deposition who these people
15   were.
16           MS. PANAGOPOULOU:  No, I know.  But my client
17   testified during his deposition that for a short time period
18   late in the evening when plaintiff alleges to have worked
19   there, my client wasn't in the premises.  That is a fact which
20   I didn't know before.  But it turns out that we would need
21   another witness to testify as to those particular late evening
22   hours.
23           THE COURT:  You will want to write me something
24   telling me why that should be permitted.  And I will give your
25   adversary an opportunity to comment and perhaps I can have a

1  telephonic conference to discuss the issue.
2          But I do think he has raised a facially valid
3  objection to having these folks testify about anything other
4  than the subject of the amendments.  So let's get that squared
5  away so that you know in advance of the trial who will be
6  testifying at the trial.
7          So, if I may, consider adding that to the list of
8  things that I will receive at the end of next week.
9          MS. PANAGOPOULOU:  Okay.
10          THE COURT:  Thank you very much.
11          Mr. Androphy, anything else today, sir?
12          MR. ANDROPHY:  That's all, your Honor.
13          THE COURT:  Okay.
14          Ms. Panagopoulou, anything else today?
15          MS. PANAGOPOULOU:  No, your Honor.
16          THE COURT:  Can I ask you please to get a transcript
17  of this proceeding in the ordinary course just so I have a
18  record of what we've been discussing today.
19          MR. ANDROPHY:  Yes, your Honor.
20          THE COURT:  Okay.  Terrific.
21          Thank you very much.  Enjoy your day.
22                         *   *   *
23
24
25